

Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | P. Michael Mahoney | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 50187 | **DATE** | 1/26/2004 |
| **CASE TITLE** | Smith vs. Barnhart | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

---

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____.  Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   For the reasons stated on the attached Memorandum Opinion and Order, Plaintiff's Motion for Summary Judgment is granted in part and denied in part. The case is remanded. This court recommends the ALJ consult a vocational expert to determine if Plaintiff can return to her previous employment and, if not, the ALJ should proceed to Step Five.  Defendant's Motion for Summary Judgment is denied.

(11) ■ [For further detail see order attached to the original minute order.]

---

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | Document Number |
| | No notices required. | number of notices | |
| ✓ | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | JAN 26 2004 | |
| | Docketing to mail notices. | date docketed | 13 |
| | Mail AO 450 form. | | |
| | Copy to judge/magistrate judge. | docketing deputy initials | |
| | | 1/26/2004 | |
| | | date mailed notice | |
| sp | courtroom deputy's initials | sp | |
| | | mailing deputy initials | |

U.S. DISTRICT COURT

04 JAN 26 PM 3:13

FILED

Date/time received in central Clerk's Office

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

JEANETTE SMITH,         )

                         )

     Plaintiff,           )       Case No. 03 C 50187

                         )

        v.               )       **Magistrate Judge**

                         )       **P. Michael Mahoney**

JO ANNE B. BARNHART,    )

**COMMISSIONER OF SOCIAL**    )

**SECURITY,**             )

                         )

     Defendant.        )

## MEMORANDUM OPINION AND ORDER

Jeanette Smith ("Plaintiff") seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner"). *See* 42 U.S.C. §§ 405(g), 1383(c)(3). The Commissioner's final decision denied Plaintiff's application for Disability Insurance Benefits ("DIB") pursuant to Title XVI of the Social Security Act (the "Act"). 42 U.S.C. §1381(a). This matter is before the Magistrate Judge pursuant to consents filed by both parties on July 15, 2003. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

## I.    BACKGROUND

Plaintiff filed for DIB on June 21, 2000, alleging disability on February 5, 1999. (Tr. 72). Plaintiff's application for benefits was denied on November 4, 2000. (Tr. 36). On February 12, 2001, Plaintiff filed a request for reconsideration. (Tr. 40). Plaintiff's request for reconsideration was denied on May 17, 2001. (Tr. 44). Plaintiff then filed a request for a hearing before an Administrative Law Judge ("ALJ") on July 29, 2001. (Tr. 50). Plaintiff appeared, with counsel, before an ALJ on July 22, 2002. (Tr. 18). In a decision dated January 27, 2003, the ALJ found that Plaintiff was not entitled to DIB. (Tr. 17). On February 3, 2003, Plaintiff requested a review of the

ALJ's decision by the Appeals Council. (Tr. 7). On April 18, 2003, the Appeals Council denied Plaintiff's request for review. (Tr. 4).

## II.  FACTS

Plaintiff was born on May 2, 1940 and was sixty-two at the time of her July 22, 2002 hearing. (Tr. 18). Plaintiff graduated from high school. (Tr. 68). At the time of her hearing, Plaintiff was married and living with her husband. (Tr. 21). Plaintiff suffers from pain associated with her cervical disc disease, bilateral carpal tunnel syndrome, diffuse arthritis, and benign positional vertigo. (Tr. 68). It is for these reasons that Plaintiff claims to be disabled.

From 1980 to 1999, Plaintiff worked for Joseph Behr & Sons ("Joseph Behr"), a recycling company. (Tr. 22). At Joseph Behr, Plaintiff worked in the precious metals division performing general clerical work such as inventory control, accounts receivable and payable accounting, occasional telephone answering, and general office filing. (Tr. 23). Plaintiff testified that during her tenure at Joseph Behr, the precious metals division closed down and, although it appears Plaintiff did not move to another division, Plaintiff remained an employee even though she was unable to perform manual labor. (*Id*.). Plaintiff testified that Joseph Behr kept her "for her brain." (*Id*.). In 1999, Plaintiff's employment at Joseph Behr ended and she received a severance package based on her eighteen years of service. (*Id*.).

After her employment at Joseph Behr, Plaintiff testified that she attempted to find another job. (Tr. 24). Specifically, Plaintiff looked for clerical work that was not demanding. However, Plaintiff was unable to find a job because most of the clerical jobs she found required use of a typewriter, computer or calculator, which Plaintiff apparently could not operate. After looking for a job, Plaintiff filed for unemployment and received unemployment compensation from February

2

1999 until August 1999. (*Id.*).

At the hearing, Plaintiff was wearing a soft cervical collar and a splint on both arms. Plaintiff testified she wears the soft cervical collar when her neck is "aching more and seems to be cracking more." (Tr. 27). Plaintiff testified she wears the arms splints "only when the base of [her] thumbs and the wrists are aching." (*Id.*). Plaintiff also stated she wears them at night. It appears that Plaintiff wears the arm splints, at least on her right hand and arm, because in 1987 Plaintiff had bilateral carpal tunnel surgery. (Tr. 28).

In closing, Plaintiff testified that she does not believe she can perform any sit down jobs because of her dexterity problems with her hands and the fact that, after holding her head in one position too long, the pain is "excruciating." (Tr. 29). Additionally, Plaintiff stated that the feeling in her fingers are such that she cannot turn pages in a book and filing is impossible. (*Id.*). Plaintiff's hand problems also prevent her from operating a mouse for a computer. (Tr. 30).

### III.  **MEDICAL HISTORY**

The earliest medical record available to this court is dated May 4, 1998. (Tr. 177). On that date, Dr. Margaret A. Myslek, of Roxbury Family Medicine, reported that physically, Plaintiff was in good health, except that Plaintiff had arthritis, mostly osteo in her knees and in her ankles. (*Id.*). Emotionally, Dr. Myslek reported, Plaintiff was not doing too well. Plaintiff's mother had died in January 1998 and Plaintiff's husband's health condition had worsened. (*Id.*). Dr. Myslek prescribed 80 mg once a day of Diovan. (*Id.*).

Plaintiff saw Dr. Myslek again on June 8, 1998. (Tr. 178). Dr. Myslek again reported that Plaintiff was doing well physically (except for some jitteriness from the Diovan). Dr. Myslek also reported that Plaintiff had improved emotionally due to her husband's improved health. (*Id.*). Dr.

3

Myslek's ultimate assessment of Plaintiff was that she was a postmenopausal female with osteoporosis risk factors. (*Id.*). Dr. Myslek also started Plaintiff on 5 mgs of Ziac. (*Id.*).

Plaintiff worsened physically. On August 31, 1998, Plaintiff again saw Dr. Myslek. (Tr. 179). Plaintiff complained that she was having more tenderness in both of her hands over the joints and was experiencing numbness in her fingers. (*Id.*). Dr. Myslek also reported that Plaintiff's blood pressure was not constant and, at times, was high. (*Id.*).

On September 17, 1998, a bilateral mammogram was performed on Plaintiff. (Tr. 190). The mammogram revealed some developing clustered microcalcification in the medial inferior aspect of Plaintiff's left breast. (*Id.*). A microscopic diagnosis was performed on October 12, 1998. (Tr. 183). The microscopic diagnosis revealed sclerosing adenosis associated with microcalcifications and apocrine metaplasia in fragments of benign breast tissue. (*Id.*).

Plaintiff continued to see Dr. Myslek in 1999 and early 2000, but there are no medical records of any substance until May 16, 2000. (Tr. 126). On that date, Dr. Myslek reported Plaintiff had neck pain and significant stiffness in both arms, neck and her lower back. (*Id.*). Additionally, Dr. Myslek noted Plaintiff again was experiencing numbness and tingling in her arms and joints. (*Id.*). Plaintiff indicated that her arm grip had weakened due to the numbness and tingling. (*Id.*). An objective medical assessment of Plaintiff revealed that she had tenderness over the neck involving the C3, C4, C5 & C6. (*Id.*). Plaintiff had restricted ROM to approximately 45 degrees to each side on rotation. Dr. Myslek reported Plaintiff's arms revealed normal sensation with an arm grip of approximately "2/5 bil." (*Id.*). Some tenderness over Plaintiff's lumbar vertebrae was noted. (*Id.*). A neck x-ray revealed discongenic disease and partial anklylosing at C5 thru C7 with mild subluxation at C4 & C5. (*Id.*).

4

Also on May 16, 2000, Dr. James J. Langan, of the Camelot Radiology Associates, performed x-rays on Plaintiff's right hand, left hand, and cervical spin. (Tr. 128-130). Dr Langan reported that the x-ray of Plaintiff's right hand revealed that the bone density was normal, no fracture, dislocation or significant arthritic involvement was noted, but that a minimal osteophyte formation was seen in the distal interphalangeal joints. (Tr. 128). An x-ray of Plaintiff's left hand revealed exactly the same thing as the x-ray of Plaintiff's right hand, according to Dr. Langan. (Tr. 129). The x-ray of Plaintiff's cervical spine revealed disk space narrowing at the C5-6 and C6-7 levels where partial ankylosis was noted. (Tr. 130). Additionally, Dr. Langan reported that there was atherosclerosis involving the right carotid artery. (*Id.*). Ultimately, based on all three x-rays, Dr. Langan reported that with regards to Plaintiff's hand there was minimal degenerative change and with regards to Plaintiff's spine, there was discogenic disease and partial ankylosis at C5 through C7 with mild subluxation of C4 upon C5. (*Id.*).

Dr. John D. Roll, of Camelot Radiology Associates, performed an MRI on Plaintiff's spine on May 20, 2000. (Tr. 127). The MRI revealed that Plaintiff had decreased disc space height with osteophyte formation and degenerative spurring at C5-6 and C6-7. (*Id.*). Also, slight anterior slippage of C4 relative to C5 was evident with minor bulging. (*Id.*). Finally, Dr. Roll reported that mild spinal stenosis was present at C5 and C6. (*Id.*).

On June 5, 2000, Dr. Myslek wrote a letter to Social Security on behalf of Plaintiff. (Tr. 124). Dr. Myslek's letter stated that Plaintiff suffers from severe degenerative disc disease in her neck. Also, Dr. Myslek's letter indicated Plaintiff experienced stiffness in her arms as well as pain, numbness and tingling in both arms. Because of these things, according to Dr. Myslek, Plaintiff "is unable to continue to do her job as an accountant, which requires a lot of computer hours." (*Id.*).

5

On September 29, 2000, Dr. Kamlesh Ramchandani, of One Eleven Medical Clinic, examined Plaintiff for thirty minutes on behalf of the Illinois Department of Rehabilitation Services. (Tr. 137). Dr. Ramchandani reported that Plaintiff complained of pain in her shoulder, joints, elbow and spine. (*Id.*). Plaintiff also indicated to Dr. Ramchandani that she could lift ten pounds and walk as far as she wants and stand as long as she wants, but when her joint pain is severe she cannot do anything at all. (*Id.*). A physical examination of Plaintiff revealed that she is able to walk heel to toe unassisted, get on and off the examination table without difficulty, dress and undress herself without assistance, and pick up objects, open and close doors, make a fist, and flip pages. (*Id.*). Plaintiff's neck was supple with no lymphadenopathy, thyromegaly or bruit. (*Id.*). An examination of Plaintiff's joints revealed that she had soft tissue swelling of the PIP and MCP joints bilaterally with hallux valgum deformity in both big toes. Tr. 138). Ultimately, Dr. Ramchandani's impressions of Plaintiff were that she suffered from osteoarthritis in multiple joints including both hands and cervical spine, benign positional vertigo, and discogenic disease of her cervical spine. (*Id.*).

A physical residual functional capacity assessment was determined for Plaintiff, based on her medical records, on October 18, 2000 by Dr. George R. Andrews. (Tr. 142-149). Dr. Andrews reported that Plaintiff can lift fifty pounds occasionally and twenty five pounds frequently. (Tr. 143). He further reported that Plaintiff can stand and/or walk about six hours in an eight hour day, sit about six hours in an eight hour day, and push and/or pull an unlimited amount of weight. (*Id.*). Dr. Andrews also reported that Plaintiff had no postural limitations (such as climbing, balancing, kneeling, etc), no manipulative limitations (such as handling, fingering, feeling, etc), no visual

6

limitations, no communicative limitations, and no environmental limitations. (Tr. 144-146). Finally, Dr. Andrews indicated that Plaintiff's cervical arthritis was supported by Plaintiff's limited range of movement of thirty degrees and her arthritis of the hands was supported by x-rays showing minimal degenerative changes. (Tr. 147). However, while Dr. Andrews indicated Plaintiff is credible in her allegations, Dr. Andrews stated the "[o]bjective evidence supports the allegations but not the degree of impairment alleged." (*Id.*). Therefore, according to Dr. Andrews, due to Plaintiff's motor strength in her upper extremities, she is limited to a full range of medium work activity. (*Id.*).

On March 4, 2001, Plaintiff filed out a Pain Questionnare. (Tr. 112). On the Questionnaire, Plaintiff indicated that her pain began in 1987 and is mainly located in her neck, hands, right elbow, shoulders, knees and feet. (*Id.*). Plaintiff indicated these pains occur daily and last hours. (*Id.*). When asked to describe how the pain has changed her activities, Plaintiff wrote "all activities have decreased over the last 14 years. I help make bed. Take laundry to basement. Occasionally help with dishes, dusting, grocery shop once a month, bath or shower daily." (Tr. 113). Under additional comments Plaintiff wrote the following: "I have worked many years with the pain because I still could do so and my co-worker helped me on bad days. I no longer am able to perform the functions required to do that job or my other, that I have been trained to do." (*Id.*).

Also on March 4, 2001, Plaintiff filed out an Activities of Daily Living Questionnaire. (Tr. 115-118). Many of the answers reflect Plaintiff's answers to the Pain Questionnaire; however, in addition, Plaintiff indicated that she cannot leave home alone because she does not drive due to vertigo and neck pain. (Tr. 116). With regards to daily activities, Plaintiff indicated that she often reads and sometimes goes to church, watches television, and talks on the phone. (Tr. 117). However, Plaintiff indicated that she rarely/never drives, watches children, fixes things, plays cards

7

or games, performs hobbies, goes to sports events, talks to neighbors, volunteers, pays bills, goes out to eat, goes to the movies, or goes to school/classes. (*Id.*).

Dr. Steven Campau, of Rockford Memorial Hospital, saw Plaintiff on May 2, 2001 for forty five minutes. (Tr. 150). Dr. Campau performed a very thorough examination of Plaintiff, most of which is not relevant. However, with regard to Plaintiff's neck examination, Dr. Campau reported no gross deformity was noted but some tenderness to the touch over the cervical spine. (Tr. 152). Additionally, Dr. Campau noted that Plaintiff was able to touch her chin to her chest, look up at the ceiling, and rotate her neck to over both her right and left shoulder with some subjective pain. (*Id.*). An examination of Plaintiff's upper and lower extremities revealed no gross deformities, with pulses in both upper and lower to be "2+ and full." (*Id.*). A musculoskeletal examination of Plaintiff's shoulder revealed minimal crepitance and an examination of Plaintiff's wrists revealed positive Tinel's sign difficulty. (Tr. 153). An examination of Plaintiff's back revealed some lordosis. (*Id.*). In summary, Dr. Campau indicated that Plaintiff had been diagnosed with carpal tunnel in the late 1980's and surgery was done without success. (*Id.*). Additionally, Dr. Campau reported that although Plaintiff had been diagnosed with benign positional vertigo, at time of the evaluation, Dr. Campau had "no documenting evidence supporting this." (*Id.*).

On July 13, 2001, in response to Plaintiff's attorney's inquiry, Dr. Myslek filed out a Residual Functional Capacity Questionnaire. (Tr. 156). On the Questionnaire, Dr. Myslek indicated that she believed Plaintiff can sit and stand for no longer then two hours and walk for no longer then four hours. (Tr. 157). Additionally, Dr. Myslek reported that Plaintiff could not crawl, climb, balance, crouch or kneel, but could bend for no more then two hours. (*Id.*). In terms of lifting, Dr. Myslek indicated Plaintiff can lift up to five pounds frequently, six to ten pounds occasionally, and

more then ten pounds never. (Tr. 158). With regards to Plaintiff's ability to use her hands, Dr. Myslek indicated Plaintiff cannot do simple grasping or arm control with either right or left, but could perform fine manipulation with her right or left. (*Id*.). Finally, Dr. Myslek indicated that Plaintiff's "bad days" would result in her absence from work more than three times a month and that Plaintiff's limitations are permanent. (Tr. 160).

On September 14, 2001, Dr. K. Stevens, of Saint Anthony Medical Center, performed a Echocardiogram on Plaintiff due to her uncontrolled hypertension. (Tr. 170). Dr. Stevens reported that Plaintiff's left ventricular dimensions appeared normal with diastolic dimensions at 4.5cm. Dr. Stevens also reported that there was borderline left ventricular hypertrophy at 1.4cm. Plaintiff's aortic root, left atrium size and right heart were all normal. (*Id*.). Plaintiff's ejection fraction was about 70%. (*Id*.). Overall, Dr. Steven's impressions of Plaintiff's Echocardiogram were that Plaintiff had borderline mild left ventricular hypertrophy, mild mitral insufficiency with normal left atrial size, and mild tricuspid insufficiency with mild pulmonary artery hypertension. (*Id*.).

## IV.   **STANDARD OF REVIEW**

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). Review by the court, however is not *de novo*; the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the [ALJ]." *Binion v. Charter*, 108 F.3d 780, 782 (7th Cir. 1997); *see also Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1999). The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case accordingly are entrusted to the commissioner; "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision

9

falls on the Commissioner." *Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001). If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see also Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). "Substantial evidence" is "evidence which a reasonable mind would accept as adequate to support a conclusion." *Binion*, 108 F.3d at 782.

The Seventh Circuit demands even greater deference to the ALJ's evidentiary determinations. So long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability," the determination must stand on review. *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992). Minimal articulation means that an ALJ must provide an opinion that enables a reviewing court to trace the path of his reasoning. *Clifford v. Apfel*, 227 F.3d 863, 874 (7th Cir. 2000), *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996). Where a witness credibility determination is based upon the ALJ's subjective observation of the witness, the determination may only be disturbed if it is "patently wrong" or if it finds no support in the record. *Pope v. Shalata*, 998 F.2d 473, 487 (7th Cir. 1993), *Imani v. Heckler*, 797 F.2d 508, 512 (7th Cir. 1986), cert. denied. "However, when such determinations rest on objective factors of fundamental implausibilities rather than subjective considerations, [reviewing] courts have greater freedom to review the ALJ decision." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994), *Yousif v. Chater*, 901 F. Supp. 1377, 1384 (N.D. Ill. 1995).

## V.    **FRAMEWORK FOR DECISION**

The ALJ concluded that Plaintiff did not meet the Act's definition of "disabled," and accordingly denied her application for benefits. "Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental

10

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(3)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(3)(C). *See Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir. 1988).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (1998).[1] The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether the claimant is capable of performing any other work in the national economy.

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520 (a),(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

Step Two requires a determination whether the claimant is suffering from a severe

---

[1]The Commissioner has promulgated parallel regulations governing disability determinations under Title II and Title XVI. See 20 C.F.R. Ch. III, Parts 404, 416. For syntactic simplicity, future references to Part 416 of the regulations will be omitted where they are identical to Part 404.

impairment.[2]  A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities.  20 C.F.R. § 404.1520(c).  The claimant's age, education, and work experience are not considered in making a Step Two severity determination.  20 C.F.R. § 404.1520(c).  If the claimant suffers from severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. Ch. III, Part 404, Subpart P, Appendix 1.  The listings describe, for each of the major body systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity. 20 C.F.R. §§ 404.1525(a).  The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry.  *Bowen v. New York*, 476 U.S. 467, 470-71 (1986).  Accordingly, if the claimant's impairment meets or is medically equivalent to one in the listings, then the claimant is found to be disabled, and the inquiry ends; if not, the inquiry moves on to Step Four.

At Step Four, the Commissioner determines whether the claimant's residual functional capacity allows the claimant to return to past relevant work.  Residual functional capacity is a measure of the abilities which the claimant retains despite his impairment. 20 C.F.R. § 404.1545(a).  Although medical opinions bear strongly upon the determination of residual functional capacity, they are not conclusive; the determination is left to the Commissioner, who must resolve any discrepancies in the evidence and base a decision upon the record as a whole.  20 C.F.R. §

---

[2]The claimant need not specify a single disabling impairment, as the Commissioner will consider the combined affect of multiple impairments.  See, e.g., 20 C.F.R. § 404.1520(c).  For syntactic simplicity, however, this generic discussion of the Commissioner's decision-making process will use the singular "impairment" to include both singular and multiple impairments.

404.1527(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1565; Social Security Ruling 82-62. If the claimant's residual functional capacity allows him to return to past relevant work, then he is found not disabled; if he is not so able, the inquiry proceeds to Step Five.

At Step Five, the Commissioner must establish that the claimant's residual functional capacity allows the claimant to engage in work found in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1566. The Commissioner may carry this burden by relying upon vocational expert testimony, or by showing that a claimant's residual functional capacity, age, education, and work experience coincide exactly with a rule in the Medical-Vocational Guidelines (the "grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d 635, 640 ( 7th Cir. 1987); *Binion v. Shalala*, 13 F.3d 243, 246 (7th Cir. 1994); Social Security Law and Practice, Volume 3, § 43:1. If the ALJ correctly relies on the grids, vocational expert evidence is unnecessary. *Luna v. Shalala,* 22 F.3d 687, 691-92 (7th Cir. 1994). If the Commissioner establishes that sufficient work exists in the national economy that the claimant is qualified and able to perform, then the claimant will be found not disabled; if not, the claimant will be found to be disabled.

## VI.    **ANALYSIS**

The court will proceed through the five step analysis in order.

A. Step One: Is the claimant currently engaged in substantial gainful activity?

In performing the Step One Analysis the ALJ found that Plaintiff had not engaged in any substantial gainful activity at any time relevant to his decision issued on January 27, 2003. (Tr. 14).

Specifically, the ALJ found "no evidence of work after the alleged onset date in this case." (Id.).

Under ordinary circumstances, a claimant is engaged in substantial gainful activity if the claimant's earnings averaged more than seven hundred and eighty dollars per month for years after January 1, 2001. (20 C.F.R. § 1574 (b) (2) Table 1, as modified by 65 FR 82905, December 29, 2000).

The finding of the ALJ as to Step One of the Analysis is not challenged by either party and the court finds no reason to disturb this finding. The ALJ's determination as to Step One of the Analysis is affirmed.

B. Step Two: Does the claimant suffer from a severe impairment?

In performing the Step Two Analysis the ALJ found Plaintiff suffered from severe impairments. Specifically, the ALJ found Plaintiff suffered from arthritis in her neck, hands, right elbow, shoulders and knees; as well as vertigo, and migraine headaches. (Tr. 14). Based on these, the ALJ found that Plaintiff's conditions produce limitations which meet the definition of severe. (Id.).

Substantial evidence exists to support the ALJ's determination that Plaintiff suffers from severe impairments. This finding is not challenged by either party and the court finds no reason to disturb it. The ALJ's finding as to Step Two of the Analysis is affirmed.

C.      Step Three: Does claimant's impairment meet or medically equal an impairment in the Commissioner's listing of impairments?

In performing the analysis for Step Three the ALJ determined that Plaintiff's impairments do not meet or equal any impairment in Appendix 1 to Subpart P of Regulations number 4. (Id.). Specifically, the ALJ found that Plaintiff's osteoarthritis does not satisfy the guidelines because it

14

has not resulted in a significant degree of functional limitation in either ambulation or fine or gross manipulative ability as demanded in Section 1.00B of Appendix 1. (*Id.*).

Substantial evidence exists to support the ALJ's finding and the court finds no reason to disturb it. Therefore, the ALJ's determination as to Step Three of the Analysis is affirmed.

D.      Step Four: Is the claimant capable of performing work which the claimant performed in the past?

In performing the analysis for Step Four, the ALJ determined that Plaintiff is able to perform past relevant work. In so finding, the ALJ first determined Plaintiff's residual functional capacity ("RFC"). After considering the entire record, the ALJ found Plaintiff's medically determinable impairments (including her exertional and nonexertional requirements) preclude the following work-related activities: "lifting more than 10 pounds at a time or more than occasional lifting or carrying small articles like docket files, ledgers or small tools; standing/walking for more than approximately two hours in an eight hour workday." (Tr. 14). In support of his finding, the ALJ first turned to the medical evidence. Looking first to Plaintiff's neck, the ALJ indicated that while x-rays revealed discogenic disease and partial ankylosis at C5-7 and mild spinal stenosis at C5-6 and mild subluxation of C4 upon C5, no herniations were detected. (*Id.*). Turning next to Plaintiff's hands, the ALJ found that while Plaintiff's arm grip was diminished bilaterally, there was no small hand muscle weakness and Plaintiff had symmetrical abduction and adduction of the fingers bilaterally as well. (*Id.*). Moreover, x-rays of both hands indicated only minimal degenerative changes. (*Id.*). Additionally, while Plaintiff's grip strength was slightly decreased and there was some swelling in the PIP and MCP joints, the ALJ found Plaintiff was still able to pick up objects, oppose thumbs to fingers, make fists, open and close doors and flip pages. (*Id.*). Finally, while the ALJ noted Plaintiff

15

was positive for Phalen's and Tinel's signs in both wrists as well as some trembling in her hands when opposing her fingers, the ALJ found no deficits in her fine manipulative abilities. (*Id.*).

Leaving the medical evidence, the ALJ next turned to Plaintiff's subjective evidence. (*Id.*). The ALJ focused first on the fact that while Plaintiff alleges an onset date of February 1999, progress notes in Plaintiff's files indicate that in April and November 1999 Plaintiff was feeling well, healthy and without complaint. (*Id.*). Additionally, the ALJ noted that Plaintiff takes only Ibuprofen for the pain and, although she wore a cervical collar and wrist sprint to the hearing, Plaintiff testified she wears the collar primarily during flare-ups of neck pain, often when the weather is bad. (Tr. 16).

However, noticeably absent (and problematic) from this whole process is a vocational expert. While the ALJ never made it to Step Five because he found that Plaintiff can return to her previous work, this court will use the analysis at Step Five with regards to the use of a vocational expert. The ALJ in this case did not apply the Medical-Vocational Guidelines (the "Grid") because, as stated above, the ALJ never made it to Step Five. However, the analysis in determining whether the ALJ should have consulted an ALJ at Step Five is very similar, if not exact, to the analysis of whether the ALJ should have consulted a vocational expert at Step Four.

The Grid is a chart that classifies a claimant as "disabled" or "not disabled" based on the individual's exertional capacity, age, education, and previous work experience. *Kornfeld v. Apfel*, No. 00 C. 5642, 2003 WL 103009, at *5 (N.D. Ill. Jan. 9, 2003); 20 C.F.R. § 404, Subpart P, Appendix 2. When appropriate, the ALJ may use the Grid alone in determining disability, and in such cases, the Grid alone constitutes substantial evidence sufficient to uphold the ALJ's decision. *See Clark v. Sullivan*, 891 F.2d 175, 179 (7th Cir. 1989). However, where the claimant suffers from severe non-exertional impairments, including pain, the use of the Grid may be inappropriate. *See*

16

*Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Specifically,

> where an individual has an impairment or combination of impairments resulting in both strength limitations and nonexertional limitations, the rules in this subpart are considered in determining first whether a finding of disabled may be possible based on the strength limitations alone and, if not, the rule(s) reflecting the individual's maximum residual strength capabilities, age, education, and work experience provide a framework for consideration of how much the individual's work capability is further diminished in terms of any types of jobs that would be contraindicated by the nonexertional limitations. Also, *in these combinations of nonexertional and exertional limitations which cannot be wholly determined under the rules in this appendix 2, full consideration must be given to all of the relevant facts* in the case in accordance with the definitions and discussions of each factor in the appropriate section of the regulations, which will provide insight into the adjudicative weight to be accorded each factor.

20 C.F.R. § 404, Subpart P, Appendix. (Emphasis added). In such cases, the ALJ must determine whether the claimant's non-exertional impairments are severe enough to substantially limit the claimant's abilities. *Walker v. Brown*, 834 F.2d 635, 641 (7th Cir. 1987).

In the instant case, the ALJ established a RFC for Plaintiff that precluded lifting more than 10 pounds at a time or more than occasional lifting or carrying small articles like docket files, and standing/walking for more than approximately two hours in an eight hour workday. (Tr. 14). Surprisingly, the ALJ did not mention any limitations on the length of time Plaintiff could work without stopping or the fact that Plaintiff may need to stop due to pain. Plaintiff alleged an inability to work due to arthritis in her neck, hands, right elbow, shoulders and knees. Putting her right elbow, shoulder and knees aside, the record indicates Plaintiff suffers pain in her neck and in her hands. The Plaintiff wore a soft cervical collar at her hearing. Plaintiff testified that she wears the collar because

the pain in her neck is so bad at times that she cannot keep her head in one position too long. (Tr. 29). The medical evidence revealed that Plaintiff has decreased disc space height with osteophyte formation and degenerative spurring at C5-6 and C6-7. (Tr. 127).

Additionally, it is undisputed that Plaintiff had unsuccessful carpal tunnel surgery. (*See* Tr. 153). In fact, Plaintiff testified that she has a hard time turning book pages, filing, or using a mouse because of the pain in her right hand. The medical evidence revealed Plaintiff experienced numbness and tingling in her arms and joints and that her arm grip was weak due to the numbness and tingling. Further, Plaintiff was positive for Phalen's[3] and Tinel's[4] signs in both wrists as well as some trembling in her hands when opposing her finger. It is hard to imagine that Plaintiff can return to work as a secretary/bookkeeper with little or no problem. At the very least it would appear Plaintiff would need some limitations in the length of time she can work without stopping and the type of work she can do. However, because the ALJ did not consult a vocational expert, this court does not have a full understanding of whether Plaintiff can in fact return to work as a secretary/bookkeeper.

Therefore, on remand, this court recommends that the ALJ consult a vocational expert to determine, given Plaintiff's limitations including the pain in her hands and neck, whether Plaintiff

---

[3] Phalen's Sign, "is performed with the patient's arms upheld vertically and the wrists dropped into flexion, fingers and thumbs extended, for 60 seconds. A positive sign includes numbness and paresthesia (tingling) in the median nerve distribution (the thumb, index and middle fingers and half of ring finger) within 60 seconds of sustained flexion." *See* http://neuro-www.mgh.harvard.edu/forum/ThoracicOutletSynd.F/PhalensSign.html (last visited January 20, 2004).

[4] Tinel's sign is a tingling or shock-like sensation in the fingers supplied by the median nerve (thumb, pointer, middle, and half of ring finger) when the skin and soft tissue over the nerve are tapped at the wrist. The transverse carpal ligament lies over the nerve at this location which is also known as the "carpal tunnel". *See* http://uscneurosurgery.com/glossary/t/tinels%20sign.htm (last visited January 20, 2004).

can return to her previous employment. This court does not suggest Plaintiff cannot return to work, but only that a more thorough analysis is needed.

## VII.   CONCLUSION

For the above stated reasons, Plaintiff's Motion for Summary Judgment is granted in part and denied in part. The case is remanded. This court recommends the ALJ consult a vocational expert to determine if Plaintiff can return to her previous employment and, if not, the ALJ should proceed to Step Five. Defendant's Motion for Summary Judgment is denied.

ENTER:

P. MICHAEL MAHONEY, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

DATE: 1/26/04